# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**MARRIO MURRELL,**

     **Plaintiff,**

     **v.**                              **Case No. 23-CV-1216-SCD**

**CITY OF OAK CREEK,**
**OAK CREEK POLICE DEPARTMENT,**
**DAVID STECKER,**
**ANDREW SAGAN,**
**ANDREW AHEARN,**
**NATHAN BASTING,**
**KATHRYN WARREN,** and
**RYAN CURRAN,**

     **Defendants.**

---

# DECISION AND ORDER
# GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

     Marrio Murrell was driving home from a fundraising event with his family when the Oak Creek police stopped him for speeding. Murrell gave the police his concealed-carry license (generally referred to as a CCW permit) and acknowledged that he had firearm on his person. After verifying that the license was valid, and without observing any other suspicious behavior, the police directed Murrell out of the vehicle so they could secure the gun and check to make sure it wasn't stolen and hadn't been used in a crime. Once everything checked out, the police returned the gun, issued Murrell a warning for speeding, and let him and his family continue their ride home.

     Though he was calm and cooperative at the time of the traffic stop, Murrell questioned whether the police treated him by the book. Unsatisfied that the officers were not disciplined

for what he believed to be a violation of his constitutional rights, Murrell sued the city, the police department, the chief of police, two police lieutenants, and the three officers in federal court. Murrell asserts several federal and state-law claims, including a violation of his right to be free from unreasonable searches and seizures and a claim for municipal liability.

The defendants have moved for summary judgment on all Murrell's claims, arguing that Murrell consented to the officers' actions, the officers did not violate Murrell's constitutional rights, the doctrine of qualified immunity shields the officers from liability, Murrell has failed to demonstrate that the police chief and the two lieutenants bear any responsibility for the officers' conduct, and Murrell has failed to present any facts supporting a municipal claim against the city or its police department. The defendants, however, focus their arguments solely on Murrell's Fourth Amendment claim and municipal liability claim. Because the defendants do not substantively address Murrell's other claims, they have not shown an entitlement to judgment as a matter of law on those claims. Nevertheless, Murrell has failed to demonstrate that the officers violated any clearly established right under the Fourth Amendment. The officers thus are entitled to summary judgment on that claim. Additionally, all the defendants are entitled to summary judgment on Murrell's municipal liability claim, as Murrell has failed to present sufficient facts from which a reasonable jury could rule in his favor on that claim. The court will therefore grant in part and deny in part the defendants' motion.

## BACKGROUND

The facts are largely undisputed, as the incident was captured on the officers' body-worn cameras, *see* Defs.' Facts Ex. B (electronically stored in the clerk's office).

At about 10:20 p.m. on February 19, 2022, Oak Creek police officers Kathryn Warren and Nathan Basting were on general patrol when they radared a vehicle traveling 39 miles per hour in a 25-mph zone. *See* Defs.' Facts ¶¶ 1–4, ECF No. 19; Pl.'s Facts ¶ 1, ECF No. 40; Defs.' Resp. to Pl.'s Facts ¶ 4, ECF No. 41-1. After briefly following the vehicle, the officers activated their emergency lights, and the vehicle pulled over. Defs.' Facts ¶¶ 5–6. Warren contacted the driver, Marrio Murrell, who handed over his driver's license and two other cards. *See id.* ¶¶ 7, 9; *see also* Pl.'s Facts ¶ 3. Murrell's wife and teenage daughter were passengers in the vehicle. Defs.' Facts ¶ 3; Pl.'s Facts ¶ 1. Warren explained that she pulled Murrell over for driving 39 in a 25 and asked if there was any reason for his speeding. *See* Ex. B, at 01:42–01:51. Murrell replied, "To be honest with you, no." *Id.* at 01:51–02:00. Warren told Murrell to stay in his vehicle, and she and Basting returned to their squad car. *Id.* at 02:00–02:30.

Once back in the squad, Warren confirmed that Murrell's driver's license was valid and that his vehicle was properly registered. *See* Pl.'s Facts ¶ 4; Defs.' Resp. to Pl.'s Facts ¶ 2; *see also* Ex. B, at 02:30–05:50. Warren also examined the two other cards Murrell had handed her: CCW permits for Wisconsin and Florida, respectively. *See* Ex. B, at 02:30–03:10. Basting, who was training Warren at the time, asked what she wanted to do about the CCW situation, noting that Murrell essentially was telling the officers that he had a gun. *Id.* at 05:50–06:45. Warren was unsure, so Basting said he'd show her what he would do in that situation. The officers first confirmed that Murrell's CCW permit was valid. *Id.* at 06:45–08:28. Basting then told Warren to leave Murrell's IDs in the squad car. Around the same time, another Oak Creek police officer, Ryan Curran, arrived at the scene. Defs.' Facts ¶ 10.

3

Officer Basting approached Murrell's vehicle and asked Murrell if he was armed. Ex. B, at 08:28–08:54. After Murrell said he was carrying a weapon near his appendix, the following exchange occurred:

Basting: We just have to have you come out.

Murrell: Sure.

Basting: I'll secure it, run the ID on it to make sure it's all good, and then we'll get you on your way.

Murrell: Okay.

*Id.* at 08:54–09:08. Murrell's wife asked why, and Basting explained that it was because Murrell admitted to having a gun inside the vehicle. *Id.* at 09:08–09:23. Murrell then exited the vehicle with his arms raised and asked, "Who's taking it off me?" *Id.* at 09:10–09:24. Basting said he would and, after some brief confusion about where Murrell's appendix is, Basting lifted Murrell's vest and removed the loaded firearm and its holster. *Id.* at 09:24–09:41.

After removing the firearm, Officer Basting asked Murrell if he had any other weapons on him. Ex. B, at 09:41–09:43. Murrell said just a spare magazine, and another exchange occurred:

Basting: This officer is just going to pat you down to make sure you got no other weapons, okay?

Murrell: I'm good.

Basting: I know. I'm just letting you know.

Murrell: Yeah, that's fine.

Basting: Okay. Sounds good.

Murrell: Who's patting me down?

4

*Id.* at 09:43–09:53. While Warren was patting him down, Murrell claimed that he was a law-abiding citizen (aside from the traffic violation), noted that he'd been courteous, and asked if the officers' actions were normal. *Id.* at 09:52–10:02. Basting said it was perfectly normal and explained that, when officers know there's a gun inside a vehicle, they have to make sure that it's not stolen and hasn't been used in a crime. *Id.* at 10:02–10:11. When Murrell indicated that he wouldn't have voluntarily given the officers his CCW permit if his gun was stolen, Basting said it was all standard procedure—he does this to every person who tells him he has a gun on him. *Id.* at 10:11–10:38. The pat-down did not reveal any other weapons or contraband. Defs.' Facts ¶ 29.

Officer Basting then removed the firearm from its holster and asked dispatch to run a check on the gun's serial number. *See* Ex. B, at 10:27–11:05. While waiting for a response, Basting unloaded the bullet from the chamber, Officer Curran handed Murrell the bullet, and Officer Warren gave Murrell back his holster. *Id.* at 11:05–12:10. Basting and Warren returned to their squad, and the officers allowed Murrell to get back in his vehicle. *Id.* at 12:10–13:40. Basting remarked, "He's probably got three other guns in the car for all we know." *Id.* at 14:20–14:25.[1] After dispatch confirmed that there were no "wants" on the firearm—which the officers expected to be the case—the officers returned Murrell's licenses and gun and gave Murrell a warning for speeding. *Id.* at 14:44–18:04. Basting also explained that it was common practice to temporarily seize firearms from CCW permit holders, pat them down, and run a check on their gun. *Id.* at 18:01–19:31. The entire stop lasted about twenty minutes.

In June 2022, Murrell filed a citizen complaint alleging that the officers violated his constitutional right to be free from unreasonable searches and seizures. *See* Exhibits to Pl.'s

---

[1] The audio of the body-cam recording is redacted at this point, but it's unclear why. *See* Ex. B, at 14:25–14:44.

Resp., ECF No. 39-1 at 18–26. Andrew Ahearn, a lieutenant with the Oak Creek Police Department, investigated the complaint, including interviewing the three officers and Murrell's wife, Dawn. *See* Recordings of interviews with Officers Warren, Basting, and Curran and Dawn Murrell (all electronically stored in the clerk's office); *see also* Transcripts of depositions for Warren, Basting, Curran, and Ahearn (available in hard copy only). Another lieutenant, Andrew Sagan, sat in on the interviews, but he did not participate in the investigation because he was the shift commander at the time of the traffic stop. *See* Transcript of deposition for Sagan (available in hard copy only). In October 2022, Chief of Police David Stecker sent Murrell a letter indicating that the investigation did not substantiate his allegations. *See* Pl.'s Resp. Ex., at 15.

Proceeding without the assistance of counsel, in September 2023, Murrell filed a complaint in federal court against the City of Oak Creek, the Oak Creek Police Department, Chief of Police Stecker, Lieutenant Sagan, Lieutenant Ahearn, Officer Basting, Officer Warren, and Officer Curran. *See* Compl., ECF No. 1. The matter was reassigned to this court after all parties consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 2, 7, 8. On April 4, 2024, the defendants filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See* Defs.' Mot., ECF No. 17; Defs.' Br., ECF No. 18. After taking several depositions, Murrell filed a response to the motion. *See* Pl.'s Resp., ECF No. 40. The defendants also filed a reply brief. *See* Defs.' Reply, ECF No. 41.

## LEGAL STANDARD

Under Rule 56, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."

6

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Liberty Lobby*, 477 U.S. at 255).

## DISCUSSION

Murrell's complaint asserts six causes of action: three federal claims under 42 U.S.C. § 1983 and three state-law claims under 28 U.S.C. § 1367(a). *See* Compl. ¶¶ 54–89. The federal claims are (1) unreasonable search and seizure against Officers Basting, Warren, and Curran; (2) municipal liability against all defendants; and (3) racial profiling and racial discrimination against the City of Oak Creek and the three officers. (Murrell is Black. *See* Compl. ¶ 4.) Murrell also brings state-law claims for (4) unreasonable search and seizure in violation of the Wisconsin Constitution against the three officers; (5) violation of the right to keep and bear arms under the Wisconsin Constitution against Officer Basting; and (6) deprivation of rights secured by section 175.60 of the Wisconsin Statutes against Officer Warren.

## I.    Officers Basting, Warren, and Curran are Entitled to Summary Judgment on Murrell's Fourth Amendment Claims

"Section 1983 of Title 42 authorizes a federal cause of action against any person who, acting under color of state law, deprives another of rights secured by federal law or the United

7

States Constitution." *Wollin v. Gondert*, 192 F.3d 616, 621 (7th Cir. 1999). The defendants appear to concede that Officers Basting, Warren, and Curran were acting under color of state law at the time they stopped, detained, and searched Murrell. However, the defendants maintain that Murrell consented to the officers' actions, that the officers did not deprive Murrell of his constitutional rights and that, even if they did, qualified immunity shields the officers from liability.

**A.**    **The defendants have not satisfied their initial burden of presenting evidence that Murrell consented to the seizure of his firearm, the pat-down search, or the gun check**

The defendants first argue that Murrell cannot succeed on his Fourth Amendment claims because he voluntarily consented to the officers' actions. "The Fourth Amendment, made applicable to the States through the Fourteenth Amendment, protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Patrick v. City of Chicago*, 81 F.4th 730, 736 (7th Cir. 2023) (quoting U.S. Const. amend. IV). "Although a warrant is often required to make a search reasonable, certain warrantless searches are also reasonable, including those conducted with . . . consent." *United States v. $304,980.00 in U.S. Currency*, 732 F.3d 812, 819 (7th Cir. 2013) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 183–84 (1990)).

"Consent may be express or implied, verbal or nonverbal, but it must be voluntarily given." *United States v. Mitchell*, No. 16 CR 436-2, -3, 2018 WL 2222576, 2018 U.S. Dist. LEXIS 81833, at *24 (N.D. Ill. May 15, 2018) (citing *United States v. Sabo*, 724 F.3d 891, 893 (7th Cir. 2013)); *see also United States v. Cotnam*, 88 F.3d 487, 495 (7th Cir. 1996) ("[C]onsent need be neither express nor verbal.") (citations omitted). "Whether [an individual] consented to a search [or a seizure] is a question of fact" to be determined from the totality of the

8

circumstances. *$304,980.00 in U.S. Currency*, 732 F.3d at 819 (citing *United States v. Williams*, 209 F.3d 940, 942–43 (7th Cir. 2000)). "The consent inquiry focuses on 'what is reasonably apparent to a reasonable inquiring officer.'" *Id.* (quoting *United States v. Grap*, 403 F.3d 439, 444 (7th Cir. 2005)).

"In civil actions under Section 1983, the Seventh Circuit has adopted a burden-shifting approach to analyze voluntary consent to warrantless searches [and seizures]." *Cardenas v. City of Chicago*, No. 08 C 2452, 2010 WL 2609866, 2010 U.S. Dist. LEXIS 63196, at *18 (N.D. Ill. June 25, 2010); *see also Wonsey v. City of Chicago*, 940 F.3d 394, 399 (7th Cir. 2019) (citing *Valance v. Wisel*, 110 F.3d 1269, 1279 (7th Cir. 1997)). The defendants bear the initial burden of presenting evidence that the plaintiff consented to the search or seizure. *See Stubenfield v. Chi. Hous. Auth.*, 6 F. Supp. 3d 779, 784 (N.D. Ill. 2013) (citing *Valance*, 110 F.3d at 1279). This burden "is not satisfied by showing a mere submission to a claim of lawful authority." *Florida v. Royer*, 460 U.S. 491, 497 (1983) (citing *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 329 (1979); *Schneckloth v. Bustamonte*, 412 U.S. 218, 233–34 (1973); *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968); *Johnson v. United States*, 333 U.S. 10, 13 (1948); *Amos v. United States*, 255 U.S. 313, 317 (1921)). If the defendants present evidence of consent, the burden shifts to the plaintiff to prove "that he never consented or that the consent was invalid because it was given under duress or coercion." *Stubenfield*, 6 F. Supp. 3d at 784 (citing *Valance*, 110 F.3d at 1279).

The defendants argue that the officers did not need a warrant to seize Murrell's firearm, pat him down, or run a check on his gun because Murrell affirmatively consented to their actions and acted in a manner consistent with consent. They note that Murrell gave the officers his CCW permits and acknowledged that he had a gun on his person. According to the defendants, Murrell verbally consented to the search of his person and the temporary

9

seizure of his firearm by saying "sure" and "okay" when Officer Basting advised that he wanted to check the weapon. The defendants insist that Murrell also verbally consented to the subsequent pat down when he said "I'm good" and "that's fine" when Basting told him they wanted to ensure he didn't have any other weapons. In addition to verbally consenting to the searches and seizure, the defendants say that Murrell impliedly consented when he willingly exited his vehicle, raised his arms in the air, and asked, "Who's taking it [the gun] off me?" The defendants maintain that Murrell's failure to object or protest the officers' actions cemented his consent.

Murrell argues that he did not consent to the officers' actions. He says that Officer Basting never asked him to step out of the vehicle so Basting could check the gun. According to Murrell, Basting ordered him to exit the vehicle, and he complied. Murrell also notes that he was detained for the traffic stop at the time Basting told him that he needed to check the gun and pat Murrell down. Murrell contends that he didn't feel he could refuse and that he couldn't leave the scene because the officers still had his licenses.

A careful review of the body-cam video shows that Murrell did not consent to the seizure of his firearm or the gun check. Officer Basting did not *ask* Murrell to exit the vehicle or for permission to remove the firearm from his person; rather, he *told* Murrell that he had to get out so the police could disarm him and check to see if the gun was stolen or used in a crime: "We just have to have you come out. I'll secure it, run the ID on it to make sure it's all good, and then we'll get you on your way." Ex. B, at 08:54–09:08. Basting's use of declarative language conveyed an order, not a request. *See United States v. Ivory*, 56 F. Supp. 3d 953, 956 (E.D. Wis. 2014) (finding that a defendant did not consent to a pat-down search when the police told him they "would have to pat him down" or "needed to pat him down" before

placing the defendant in the back of a squad car); *United States v. Cole*, 195 F.R.D. 627, 631–33 (N.D. Ind. 2000) (finding lack of consent where a defendant was told what to do rather than asked for permission).

Thus, Murrell's comments of "sure" and "okay" and raising of his arms constituted acquiescence to police authority rather than agreement. *See Royer*, 460 U.S. at 497 (holding that the government cannot satisfy its burden of demonstrating "that the necessary consent was obtained . . . by showing a mere submission to a claim of lawful authority"); *Ivory*, 56 F. Supp. 3d at 956 ("A person in defendant's situation cannot be expected to argue with the officer or resist the pat down in order to preserve his Fourth Amendment rights."); *Cole*, 195 F.R.D. at 633 (finding a defendant's silence and lack of resistance to be "acquiescence to a claim of lawful authority," not voluntary consent). Indeed, at the time of the searches and seizure, Murrell was still being detained for the traffic stop, and the officers had deliberately left his IDs in the squad car. Compliance does not equal consent under those circumstances.

Similarly, the body-cam video shows that Murrell did not consent to the subsequent pat-down search. After confiscating the gun, Officer Basting *told* Murrell that Officer Basting was "going to pat [him] down to make sure [he didn't have any] other weapons." Ex. B, at 09:43–09:53. Basting did end his statement by saying, "Okay?" However, the context of the situation suggests that wasn't a genuine request. After Murrell said he was "good," Basting replied, "I know. I'm just letting you know." *Id.* In other words, Basting was just letting Murrell know what was going to happen; a response wasn't needed. Murrell's act of raising his arms was submission, not consent.

Moreover, although Murrell did not expressly object to the seizure of his firearm, the pat-down search, or the gun check, he did question the propriety of the officers' actions. While

being patted down, Murrell noted that he hadn't committed a crime and that he had been cooperative. *See* Ex. B, at 09:52–10:38. He then asked if the officers' actions were normal, and Officer Basting claimed it was all by the book. This interaction reinforces that Murrell's words and conduct amounted to acquiescence to police authority.

It's also worth mentioning, despite the objective nature of the inquiry, that Officer Basting did not appear to view the encounter as a consent search and seizure. He did not tell his fellow officers that he planned to ask Murrell for permission to secure and check his firearm. Rather, Basting implied that the search and seizure were pursuant to department policy. *See Ivory*, 56 F. Supp. 3d at 956 (noting, in addition to the objective facts, that the officers did not subjectively view the pat down as a consent search).

The cases cited by the defendants do not mandate a different result here, as none involved acquiescence to police authority. In two of those cases, the police explicitly asked the defendants for permission to search; the issue was whether the defendants' ambiguous responses established consent. *See United States v. Gonzalez-Ruiz*, 794 F.3d 832, 834–36 (7th Cir. 2015) (defendant said "I guess" and nodded when officer asked if defendant minded the officer taking a look in his car); *United States v. Price*, 54 F.3d 342, 344–47 (7th Cir. 1995) (defendant said "Sure" when officer asked if defendant minded the officer taking a look in his car). The defendants' failure to object to the searches resolved the ambiguity in favor of finding consent. In contrast, Officer Basting never asked Murrell for permission to search him and seize his firearm; he simply told Murrell what the police were going to do. Murrell's failure to object therefore constituted submission to police authority.

The other two cases cited by the defendants involved implied consent. In *Harajli v. Huron Township*, the Sixth Circuit found that the defendant's ex-wife impliedly consented to

the police's entry into the defendant's home when she asked the police to accompany her to the house to collect her belongings and didn't object when one officer entered the interior of the house. 365 F.3d 501, 506 (6th Cir. 2004). And in *United States v. Ortiz*, the Sixth Circuit found that the defendant impliedly consented to the police's entry into his apartment when he stepped back, gestured, and opened the door wider when the police asked if they could step inside to ask him some questions. 455 F. App'x 669, 671–72 (6th Cir. 2012). In our case, however, Murrell's actions of exiting his vehicle and raising his arms were in response to Officer Basting's statements that the police needed to secure and check his firearm and that Officer Warren was going to pat him down. Murrell's cooperative demeanor and compliance constitute acquiescence, not implied consent.

Accordingly, the defendants have not satisfied their initial burden of presenting evidence that Murrell consented to the seizure of his firearm, the pat-down search, or the gun check. At the very least, there's a factual dispute as to whether Murrell's words and actions established consent. Based on the body-cam video, a reasonable jury could find that Murrell did not consent to the officers' actions. *See Pendleton v. Murphy*, No. 1:20-cv-00489-JPH-TAB, 2022 WL 4095167, 2022 U.S. Dist. LEXIS 161144, at *22–24 (S.D. Ind. Sept. 7, 2022) (denying defendants' motion for summary judgment on plaintiff's unlawful frisk claim because "a jury could reasonably find that [the officer] did not ask [the plaintiff] for permission to conduct a pat-down but rather told him that he was going to conduct a pat-down").

### B.    A reasonable jury could find that the officers violated Murrell's Fourth Amendment rights

The defendants also argue that the officers did not violate Murrell's Fourth Amendment right to be free from unreasonable searches and seizures. Murrell first challenges the initial stop, arguing that the defendants have failed to provide documentation to prove that

13

he was speeding. The defendants, however, do not need to conclusively demonstrate that Murrell was speeding to justify the initial stop. "Under the Fourth Amendment, a police officer may lawfully stop a car when the officer has reasonable suspicion that the car is involved in a traffic offense." *United States v. Phillips*, No. 23-1692, 2024 WL 3842092, 2024 U.S. App. LEXIS 20739, at *7 (7th Cir. Aug. 16, 2024) (citing *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)). "[T]he reasonable belief that a driver committed even a minor traffic infraction will support a stop." *Id.* (citing *United States v. Jackson*, 962 F.3d 353, 357 (7th Cir. 2020)).

Here, the undisputed facts show that Officer Warren reasonably believed Murrell was speeding. Warren said she radared Murrell traveling 39 miles per hour in a 25-mph zone. Murrell does not genuinely dispute this fact. Indeed, when asked at the time of the stop if there was a reason why he was speeding, Murrell responded, "To be honest with you, no." Ex. B, at 01:51–02:00. He also later told Warren that he doesn't normally speed. *See id.* at 17:30–17:38. Thus, Murrell essentially admitted that he had committed a traffic violation. Reasonable suspicion of a traffic infraction gave Warren authority to stop Murrell and investigate, including questioning Murrell and asking him to step out of his vehicle. *See Rodriguez*, 575 U.S. at 354; *see also Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977) (per curiam) ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.").

Murrell also challenges the length of the stop, arguing that the officers should have let him leave after confirming that his CCW permit was valid. "[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably

14

infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (citing *United States v. Jacobsen*, 466 U.S. 109, 124 (1984)). For example, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.* "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop,'" including attending to related safety concerns. *Rodriguez*, 575 U.S. at 354–55 (quoting *Caballes*, 543 U.S. at 408). "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355 (citing *Delaware v. Prouse*, 440 U.S. 648, 658–60 (1979)). "These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.* (citing *Prouse*, 440 U.S. at 658–59; 4 W. LaFave, Search and Seizure § 9.3(c), pp. 507–17 (5th ed. 2012)).

The defendants insist that the officers did not unreasonably extend the stop beyond the time necessary to address the traffic violation and the safety concerns presented by Murrell's admitted possession of a concealed weapon. In *Terry v. Ohio*, the Supreme Court held that a limited search for weapons does not violate the Fourth Amendment if the stop is lawful and the police officer "reasonably suspect[s] that the person stopped is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). The Court also explained that a "protective search for weapons is a vital tool to serve the 'immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him.'" *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006) (quoting *Terry*, 392 U.S.

at 23); *see also Adams v. Williams*, 407 U.S. 143, 146 (1972) ("The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence."). After all, "it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." *Terry*, 392 U.S. at 23.

The undisputed facts show that the initial stop was lawful and that the officers reasonably believed Murrell was armed (Murrell presented his CCW permit and, when asked by Officer Basting, Murrell acknowledged that he was armed with a concealed weapon); however, the defendants present no evidence suggesting that Murrell was otherwise dangerous. Murrell was stopped for a speeding violation and was accompanied in the vehicle by his wife and his teenage daughter. At the time Basting told Murrell to exit the vehicle so he could secure the gun, the officers knew that Murrell's driver's license and CCW permit were valid and that his vehicle was properly registered. Murrell remained calm and cooperative throughout the entire encounter, kept his hands on the steering wheel, and even asked for permission to remove his seatbelt. Murrell also exited the vehicle with his arms raised, and he never reached near the gun.

The defendants seem to believe that the presence of the firearm alone warranted a reasonable fear for the officers' safety. In other words, as the defendants see it, if the police reasonably suspect an individual is "armed," they necessarily suspect he is also "dangerous." At times the Supreme Court has appeared to collapse "armed" and "dangerous" into a single, unitary concept. *See, e.g.*, *Terry*, 392 U.S. at 28 ("We think on the facts and circumstances Officer McFadden detailed before the trial judge a reasonably prudent man would have been warranted in believing petitioner was armed *and thus* presented a threat to the officer's safety while he was investigating his suspicious behavior.") (emphasis added); *Mimms*, 434 U.S. at

16

112 ("The bulge in the jacket permitted the officer to conclude that Mimms was armed *and thus* posed a serious and present danger to the safety of the officer."). Some lower courts have adopted this view. *See, e.g.*, *United States v. Robinson*, 846 F.3d 694 (4th Cir. 2017) (en banc); *United States v. Rodriguez*, 739 F.3d 481 (10th Cir. 2013); *United States v. Orman*, 486 F.3d 1170 (9th Cir. 2007).

However, when elaborating on the test for a lawful frisk, the Supreme Court has emphasized the independent role of dangerousness. For example, in *Michigan v. Long*, the Court explained that *Terry* authorizes a protective search of an automobile if law enforcement reasonably believes "that the suspect is dangerous and the suspect may gain immediate control of weapons." 463 U.S. 1032, 1049–50 (citing *Terry*, 392 U.S. at 21). Consequently, the Seventh Circuit has held that a frisk for weapons during a lawful investigatory stop is permitted only "if the officers have an articulable suspicion that the person is *both* armed *and* a danger to the safety of officers or others." *United States v. Leo*, 792 F.3d 742, 748 (7th Cir. 2015) (emphasis added) (citing various cases, including *Terry*). The Seventh Circuit is not alone in its view. *See, e.g.*, *Northrup v. City of Toledo Police Dep't*, 785 F.3d 1128, 1132 (6th Cir. 2015) ("Clearly established law required [the officer] to point to evidence that [the suspect] may have been armed *and dangerous*.") (citation and internal quotation marks omitted).

In *Leo*, the Seventh Circuit also noted the difficulty of applying *Terry* and its progeny in a state like Wisconsin, which permits carrying a concealed weapon. *Leo*, 792 F.3d at 752 (citing Wis. Stat. § 175.60(3)). The court acknowledged "that the Supreme Court has made clear that the Second Amendment protects the individual right to keep and bear arms[] and applies equally to the states through the Fourteenth Amendment." *Id.* (citing *District of Columbia v. Heller*, 554 U.S. 570, 635–36 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 791

17

(2010)). Against that backdrop, the Seventh Circuit recently suggested—albeit in dicta—that a "concealed-carry license does not, by itself, justify a *Terry* frisk." *United States v. Colbert*, 54 F.4th 521, 531 n.6 (7th Cir. 2022) (citing *Leo*, 792 F.3d at 752). For if that were the case, then all permit holders essentially would forfeit certain Fourth Amendment protections by lawfully exercising their Second Amendment rights. *See Northrup*, 785 F.3d at 1132 ("To allow stops in this setting would effectively eliminate Fourth Amendment protections for lawfully armed persons.") (citation and internal quotation marks omitted); *Robinson*, 846 F.3d at 707 ("But unless and until the Supreme Court takes us there, I cannot endorse a rule that puts us on a collision course with rights to gun possession rooted in the Second Amendment and conferred by state legislatures.") (Harris, J., dissenting).[2]

Because neither the Supreme Court nor the Seventh Circuit has adopted an automatic frisk rule for lawfully stopped individuals who possess firearms, and because the defendants present no other evidence suggesting that Murrell was dangerous, the defendants are not entitled to summary judgment on the merits of Murrell's unreasonable search and seizure claim.

Even if the officers acted reasonably in temporarily seizing Murrell's firearm during the traffic stop, the defendants present no justification for asking dispatch to run a check on the gun's serial number. Officer Basting said he needed to check the gun to confirm that it wasn't stolen or used in a crime. *See* Ex. B, at 08:54–09:08, 10:05–10:30, 18:01–19:08. But the purpose of a protective search for weapons is officer safety, not investigating crime. *See Terry*,

---

[2] Since deciding *Heller* and *McDonald*, the Supreme Court has further strengthened Second Amendment protections. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) (adopting a new test to scrutinize modern firearm regulations).

392 U.S. at 23; *Adams*, 407 U.S. at 146. Thus, the officers appear to have violated Murrell's Fourth Amendment rights when they prolonged the stop to run the gun check, as the mission of the stop was already complete at that point.[3] *See Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) ("If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry*.") (citing *Sibron v. New York*, 392 U.S. 40, 65–66 (1968)).

### C.   Qualified immunity shields the officers from liability on Murrell's Fourth Amendment claims

Finally, the defendants argue that qualified immunity protects them against suit for each of the alleged Fourth Amendment violations. "For civil damages claims under 42 U.S.C. § 1983 for violations of constitutional rights, the doctrine of qualified immunity 'shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Muhammad v. Pearson*, 900 F.3d 898, 903 (7th Cir. 2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)). "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Mullenix*, 577 U.S. at 12). "To overcome a defendant's invocation of qualified immunity, a plaintiff must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Id.* (quoting *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017)). "If the answer to either question is no, the defendant official is entitled to qualified immunity." *Id.* at 904 (citing *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014)).

---

[3] The officers spent nearly half of the twenty-minute stop on the gun check. *See* Ex. B, at 10:27–19:33.

Taking the facts in the light most favorable to Murrell, a jury reasonably could conclude that the officers violated Murrell's Fourth Amendment right to be free from unreasonable searches and seizures. Murrell alleges several violations concerning the stop, the seizure of his firearm, and the pat-down search. Although the undisputed facts show that the initial stop was justified based on the traffic violation, the police did not have a warrant for their other actions. Their conduct therefore is presumptively unreasonable. The defendants attempt to rebut this presumption by arguing that Murrell consented to all the officers' actions. However, as explained above, Murrell's compliance—saying "sure" and "okay," exiting the vehicle, and raising his arms so the police could remove his firearm and pat him down—constituted mere acquiescence to police authority under the circumstances. At the very least the body-cam video creates a jury question on whether Murrell consented.

Moreover, Murrell has presented sufficient evidence to permit a reasonable jury to find that the officers unreasonably prolonged the traffic stop, unreasonably seized his firearm, and unreasonably patted him down. At the time of those actions, the officers suspected Murrell of committing only a minor traffic violation; they did not suspect he had committed a crime. They also knew that Murrell's driver's license and CCW permit were valid and that his vehicle was properly registered. And they had no reason to believe that Murrell was dangerous aside from the fact that he admitted to being armed with a concealed weapon—which is legal with a permit. Based on those facts, a reasonable jury could conclude that the stop should have ended with a speeding ticket or a warning and that the seizure of the firearm and the pat-down search were unreasonable.

Nevertheless, Murrell has failed to demonstrate that the stop, the seizure of the firearm, or the pat-down search violated clearly established law. "The plaintiff bears the

burden of demonstrating that a right was clearly established at the time the alleged violation occurred." *Green*, 868 F.3d at 633 (citing *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 359 (7th Cir. 2005)). "For a right to be clearly established, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Mullenix*, 577 U.S. at 12). "The right must be 'sufficiently clear that every reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Mullenix*, 577 U.S. at 11).

"The Supreme Court has instructed that 'clearly established law should not be defined at a high level of generality.'" *Green*, 868 F.3d at 633 (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam)). "While a case directly on point is not required, 'the clearly established law must be particularized to the facts of the case." *Ibid.* "[S]uch specificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Id.* (quoting *Mullenix*, 577 U.S. at 12). "It is usually necessary to identify an instance in which 'an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment,' though in the 'rare obvious case' the violation may be sufficiently clear 'even though existing precedent does not address similar circumstances.'" *Torry v. City of Chicago*, 932 F.3d 579, 587 (7th Cir. 2019) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018)).

Murrell has not identified, and the court has not found, an instance in which an officer acting under similar circumstances was held to have violated the Fourth Amendment, nor does he argue that the violations alleged here are obvious. He cites cases that discuss the general standards for a seizure: *State v. Williams*, 646 N.W.2d 834 (Wis. 2002); for a pat-down search following a traffic stop: *Arizona v. Johnson*, 555 U.S. 323 (2009); for determining whether

a traffic stop is unreasonably prolonged: *Illinois v. Caballes*, 543 U.S. 405 (2005); and for a pat-down search following a street stop: *United States v. DeBerry*, 76 F.3d 884 (7th Cir. 1996). However, none of those cases involves a factual situation like the one facing the officers in our case.

In any event, I am convinced that a reasonable police officer could have believed that the conduct of Officers Basting, Warren, and Curran "was lawful 'in light of clearly established law and the information [the officers] possessed' at the time." *Valance*, 110 F.3d at 1280 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)); *see also Rouei v. Village of Skokie*, 61 F. Supp. 3d 765, 778 (N.D. Ill. 2014) (finding it likely that "arguable reasonable suspicion" would shield officers from liability in a *Terry* stop case). In *Terry* – 1968, *Adams* – 1972, and *Mimms* – 1977, the Supreme Court held that law enforcement officers may, for officer safety, perform a warrantless protective search for weapons when they reasonably believe that a lawfully stopped person is armed and dangerous. Although the Supreme Court (in *Long* – 1983) and the Seventh Circuit (in *Leo* – 2015) have clearly established that officers must reasonably suspect that the person is *both* armed *and* dangerous, neither court has held that a frisk cannot be justified based solely on the possession of a concealed weapon. And both courts have recognized the danger posed by a forced police encounter and the presence of a gun. *See, e.g.*, *Adams*, 407 U.S. at 146; *DeBerry*, 76 F.3d at 886.

In sum, Murrell has failed to carry his burden of showing that the law was clearly established at the time of the traffic stop. The officers therefore are entitled to qualified immunity on Murrell's Fourth Amendment claims.

22

## II.    All Defendants are Entitled to Summary Judgment on Murrell's Municipal Liability Claim

In addition to the alleged Fourth Amendment violations by the officers, Murrell asserts a municipal liability claim against each defendant, including the City of Oak Creek, the Oak Creek Police Department, Chief of Police Stecker, Lieutenant Sagan, and Lieutenant Ahern. Section 1983 plaintiffs "must show that the defendants were personally responsible for the deprivation of their rights." *Wilson v. Warren County*, 830 F.3d 464, 469 (7th Cir. 2016) (citing *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). "A defendant is personally responsible 'if the conduct causing the constitutional deprivation occurs at his direction or with his knowledge and consent.'" *Id.* (quoting *Gentry*, 65 F.3d at 561). Likewise, to succeed on a claim against a municipality, a Section 1983 plaintiff must show "that a policy or widespread practice of the City caused his alleged injuries." *Shachter v. City of Chicago*, 848 F. App'x 208, 210 (7th Cir. 2021) (citing *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690–92 (1978)).

Murrell has not presented any evidence from which a reasonable jury could find that Stecker, Sagan, or Ahearn were personally responsible for the deprivation of his rights. They are not mentioned anywhere in the complaint's factual allegations. *See* Compl. ¶¶ 15–53. Also, the undisputed facts show that they were not present at the scene of the traffic stop, and nothing suggests that they directed or consented to the officers' actions. Murrell seems to believe that the supervising officers are liable because they failed to discipline the street officers. *See* Compl. ¶¶ 59–67. Even if that were the case, however, those actions did not cause and would not have prevented the harm Murrell alleges in his complaint. Accordingly, Stecker, Sagan, and Ahearn are entitled to summary judgment on Murrell's municipal liability claim.

Murrell also fails to present any evidence to support a *Monell* claim against the City or the police department. He alleges that the defendants have a pattern, practice, and custom of subjecting citizens to unlawful detentions, an ongoing pattern and practice of subjecting Black/African Americans to unjustifiable claims, and an ongoing and regular practice of subjecting persons of color to pretextual stops. *See* Compl. ¶¶ 49, 53, 62, 64–65. However, Murrell provides no facts to support his conclusory allegations. *See Shachter*, 848 F. App'x at 210 (affirming the dismissal of a *Monell* claim because the plaintiff "provided no facts suggesting that any of the alleged actions of the [city] attorneys extend[ed] beyond [his] situation."). All defendants therefore are entitled to summary judgment on Murrell's *Monell* claim.

## III. Remaining Claims

The defendants ostensibly have moved for summary judgment on each of Murrell's claims. However, with respect to Murrell's federal claims, their briefs substantively discuss only the federal search and seizure claim and the municipal liability claim. There is no explicit discussion of the claim that Murrell was treated differently because he is Black. The defendants do argue at length that their conduct was constitutional, however, which I may interpret (even though they do not describe it as such) as an argument that their actions were not the product of racial profiling or any other kind of improper animus. I interpret the argument in this fashion because Murrell himself does not provide any evidence that his race played a material role in the stop. He suggests that the police treated him differently than his wife and daughter (who are white), Compl., ¶ 70, but he was the car's driver, and it was he who volunteered his CCW permit. As such, their disparate treatment of him appears to be the result of legitimate police work rather than anything having to do with his race. Because

24

Murrell is proceeding *pro se,* however, and because the defendants' argument was hardly obvious, I will give Murrell a chance to respond. *See* Fed. R. Civ. P. 56(f). He may present evidence underlying his race-based claim within 14 days of the date of this decision. The defendants may respond within 7 days. The court will withhold ruling on the plaintiff's remaining state-law claims.

## CONCLUSION

In sum, qualified immunity shields the officers from liability on Murrell's Fourth Amendment claims, and Murrell has failed to present sufficient evidence from which a reasonable jury could rule in his favor on his municipal liability claim. Accordingly, the court **GRANTS in part** the defendants' motion for summary judgment, ECF No. 17. The court **DISMISSES** Murrell's Fourth Amendment claim (Count I) and municipal liability claim (Count II) and, along with those claims, the City of Oak Creek, the Oak Creek Police Department, David Stecker, Andrew Sagan, and Andrew Ahearn. Murrell may file evidence supporting his race-based claim within 14 days of the date of this order; the defendants may respond within 7 days. The court will then issue a decision addressing the remainder of the claims Murrell asserts.

**SO ORDERED** this 3rd day of October, 2024.

STEPHEN C. DRIES
United States Magistrate Judge